<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
──────────────────────────────
                          :
DONNELL CRADLE,           :
                          :          Civil No. 02-2121 (JWB)
          Petitioner,     :
                          :
     v.                   :
                          :              OPINION
JOSEPH BROOKS, FCI WARDEN,:
AND DAVID SAMSON, ATTORNEY:
GENERAL OF THE STATE OF NEW :
JERSEY,                   :
                          :
          Respondents.    :
                          :
──────────────────────────────
```

**APPEARANCES:**

DONNELL CRADLE, Petitioner <u>Pro Se</u>
# 16639-056
P.O. Box 90043
Petersburg, Virginia 23804

STEVEN JAY KAFLOWITZ, ESQ.
UNION COUNTY PROSECUTOR'S
Union County Administration Building
32 Rahway Avenue
Elizabeth, New Jersey 07207
Attorneys for Respondents

**BISSELL, Chief Judge**

This matter is before the Court on petitioner Donnell

Cradle's application for habeas corpus relief under 28 U.S.C. §

2254.  For the reasons stated below, the petition for habeas

relief will be denied for failure to make a substantial showing

of a federal statutory or constitutional deprivation.

I.   BACKGROUND[1]

A.  Procedural History

     Petitioner, Donnell Cradle ("Cradle"), is presently confined

in the Federal Correctional Institution in Petersburg, Virginia,

pursuant to a federal judgment of conviction.   However, in this

petition, Cradle challenges a 1996 state court conviction and

sentence that is to be served upon completion of his federal

sentence.

     On September 15, 1994, a Union County Grand Jury returned a

three count indictment, charging Cradle with the following

offenses: Count 1: third degree possession of cocaine, in

---

     [1]  In answering the habeas petition, Respondents submitted
the following documentary materials for review:

     Ra1   State's Appellate Division Brief
     Ra2   Judgement of Conviction
     Ra3   Union County Indictment No. 94-09-01009
     Ra4   Petitioner's petition for certification before New
           Jersey Supreme Court
     Ra5   State's answer to petition
     Ra6   New Jersey Supreme Court order denying petition
     Ra7   Trial Transcript of April 4, 1996
     Ra8   Trial Transcript of April 16, 1996
     Ra9   Trial Transcript of April 17, 1996
     Ra10  Trial Transcript of April 18, 1996
     Ra11  Trial Transcript of April 23, 1996, Volume I
     Ra12  Trial Transcript of April 23, 1996, Volume II
     Ra13  Trial Transcript of April 24, 1996
     Ra14  Trial Transcript of April 25, 1996
     Ra15  Trial Transcript of May 1, 1996
     Ra16  Trial Transcript of May 2, 1996
     Ra17  Trial Transcript of May 17, 1996, Part I
     Ra18  Trial Transcript of May 18, 1996, Part II
     Ra19  Trial Transcript of May 19, 1996
     Ra20  Trial Transcript of May 20, 1996

violation of N.J.S.A. 2C:35-10a(1); Count 2: first degree possession of cocaine with intent to distribute, in violation of N.J.S.A. 2C:35-5a(1) and N.J.S.A. 2C:35-5b(1); Count 3: third degree hindering prosecution, in violation of N.J.S.A 2C:29-3.

On April 16, 1996, the State made a motion before the Honorable Edwin R. Alley, J.S.C., to try the defendant, Cradle, in absentia. (Ra8 6:19-9:9). At the time, petitioner was believed to be staying at his house in North Carolina. The following day, April 17, 1996, Judge Alley heard argument and granted the State's motion. (Ra9 9:3-11:12). Cradle's attorney requested leave to file an interlocutory appeal, which was denied. (Ra9 11:13-15).[2]

On April 17, 1996, a <u>Miranda</u> hearing was held in which the judge again denied defense counsel's request to stay the trial. (Ra9 102:19- 103:16). The matter proceeded to trial before Judge Alley on April 18, 1996, and concluded on May 9, 1996. Cradle was found guilty as charged in the indictment. He was then sentenced on July 17, 1998 before Judge Alley. Cradle did appear at his sentencing hearing. The court merged Counts One and Two, and sentenced Cradle to a custodial term of 18 years with a nine-year parole ineligibility period on Count Two. Cradle was

---

[2] On May 7, 1996, the Superior Court of New Jersey, Appellate Division, denied a stay of defendant's trial.

sentenced to a concurrent prison term of five years on Count
Three.

On October 21, 1998, Cradle filed a notice of appeal. On
February 13, 2001, the Superior Court of New Jersey, Appellate
Division denied Cradle's appeal, affirming the conviction and
sentence without discussion.  Cradle then filed a petition for
certification with the Supreme Court of New Jersey, on March 15,
2001, which was later denied on April 27, 2001.

Thereafter, on April 26, 2002, and as amended on September
30, 2002, Cradle submitted the instant petition for federal
habeas relief under 28 U.S.C. § 2254.  Respondents answered the
petition and provided the Court with the relevant state court
record on February 3, 2003.

B.  Factual Background

The following rendition of facts are taken from the state
court record; in particular, the state appellate court opinion.

On June 19, 1994, around 12:04 p.m., New Jersey State Police
Trooper Eric Estok was traveling southbound on the outer roadway
of the New Jersey Turnpike in an unmarked squad car.  He observed
two cars, a black Toyota and a white Buick, in the southbound
inner roadway making frequent lane changes and tailgating other
cars in the lane.  Trooper Estok then paced the two cars in order
to determine their speed since he was not equipped with radar.

4

Once he determined that they were traveling in excess of the
speed limit, he pulled the two cars over to the shoulder.

Estok first approached the passenger side of the Toyota
where he asked the occupants for identification.  While obtaining
this information, Estok noticed suspicious behavior by the
occupants of the Buick.  Specifically, Estok noticed that the
occupants were not looking around for identification, but
instead, they were sitting stiff and looking straight forward as
they talked to each other.  Cradle was the front seat passenger
in the Buick.

After obtaining the requested identification information
from the occupants of the Toyota, Estok proceeded to the
passenger side of the Buick.  He then asked the driver of the
Buick, William Pabon, for his identification.  Based on the
suspicious behavior of the Buick's occupants as well as the smell
of marijuana in the car, Estok went to the rear of the Buick
after he had obtained Pabon's identification, and radioed for
back-up.  While radioing for back-up, Pabon placed the Buick into
drive.  Estok shouted for Pabon to turn off the car.  Pabon
complied and agreed to turn over his keys to the officer.

Estok then re-approached the passenger side of Pabon's Buick
to retrieve the keys from Pabon.  As Estok neared, he noticed
defendant Cradle reach under his seat and toss a brown paper bag
to Kermit Ball, the left rear passenger.  Ball opened the car

5

door and ran across both southbound and northbound lanes of the Turnpike until he reached a marshy swamp area along the shoulder of the Turnpike. New Jersey State Trooper Gregory Sanders, responding to Estok's call for back-up, observed Ball running across the Turnpike and followed him on foot. Sanders continued pursuit of Ball through the marshy area and observed that Ball was carrying a brown bag, which Ball then threw in the direction of a fence by a rail yard. Soon after, Ball was apprehended by Sanders and other troopers responding to Estok's call for back-up. New Jersey State Troopers Gyongyosi and O'Donnell then entered the marshy area and retrieved the brown paper bag that Ball had tossed. Upon inspection, the troopers noticed that the bag contained a white bag filled with a powdery white substance.

Ball was brought back to the location of the Buick. Cradle, Pabon, Ball, and a fourth occupant of the Buick, Daniel McDuffie, were seated on a guardrail as Estok advised them of their <u>Miranda</u> rights off of a card he had in his possession. The four men appeared to understand their rights at the time. They were then arrested. Estok issued four summons based on the various traffic violations. In addition, Estok asked the four men about the brown bag. They all denied possession or knowledge of the bag being in the car.

Defendants were then transported to the Newark Police barracks where they were processed and further questioned. In

6

addition, they were re-advised of their Miranda rights to which
they acknowledged.  During questioning, it was determined that
the defendants had traveled from North Carolina to New York the
previous day, and they were headed back to North Carolina before
they were stopped by Estok.

During the trial, Francis Garland, a senior forensic chemist
for the Union County Prosecutor's Office, identified the white
powdery substance from the brown bag dropped at the scene as
cocaine.  Garland determined that the substance weighed 484.2
grams (17.07 ounces).  He also determined that the purity level
of the cocaine was 74.1%.

Gregory Clay, a sergeant with the Narcotics Strike Force of
the Union County Prosecutor's office, also testified in relation
to the brown bag found at the scene.  He stated that based on his
specialized training in the area of narcotics distribution, he
determined that the defendants had possessed the cocaine with the
intent to distribute it.  Sergeant Clay testified that based on
the quantity found within the brown bag, defendants did not
possess the cocaine for the purpose of personal use.  He based
this on the fact that the value of the cocaine was between $600
to $900 per ounce.  He further stated that if the block of
cocaine was cut with non-cocaine white substance, its value would
be between $36,500 and $73,000.  Sergeant Clay also noted that
the New York-New Jersey area in which the defendants were

7

apprehended, is a corridor for drug trafficking, and it was likely that the defendants had possessed the cocaine with an intent to distribute.

## II.   CLAIMS FOR HABEAS RELIEF

Cradle raises the following claims in his federal habeas petition:[3]

Ground One: The trial court erred in allowing Cradle to be tried in absentia.

Ground Two: The trial court erred in admitting into evidence at trial Cradle's statement, which was taken in violation of his Miranda rights under the Fifth Amendment.

## III.   STANDARDS GOVERNING PETITIONER'S § 2254 CLAIMS

The Court recognizes that a pro se pleading is held to less stringent standards than more formal pleadings drafted by attorneys.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  Thus, a pro se habeas petition should be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); Duarte v.

---

[3]  Cradle had raised a third claim in his initial petition, relating to Apprendi v. New Jersey, 530 U.S. 460 (2000), but later withdrew the claim since he had not exhausted his state court remedies before bringing said claim in his federal habeas petition.  See Cradle's Motion to Delete from Petition Unexhausted Claims, dated May, 22, 2003, and filed June 5, 2003 (Docket Entry No. 13).  The State concedes that the remaining two claims with respect to the in absentia ruling and violation of Miranda rights were fully exhausted before the state courts.

Hurley, 43 F. Supp.2d 504, 507 (D.N.J. 1999).  Because Cradle is

proceeding pro se in his application for habeas relief, the Court

will accord his petition the liberal construction intended for

pro se litigants.

Under § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas

matters must give considerable deference to determinations of the

state trial and appellate courts.  See 28 U.S.C. § 2254(e);

Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122

S.Ct. 269 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir.

1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).  Section

2254(d) sets the standard for granting or denying a habeas writ:

> (d)  An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment
> of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim –
>
>> (1)  resulted in a decision that was contrary to, or
>> involved an unreasonable application of, clearly
>> established Federal law, as determined by the
>> Supreme Court of the United States; or
>>
>> (2)  resulted in a decision that was based on an
>> unreasonable determination of the facts in light
>> of the evidence presented in the State court
>> proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme

Court explained that subsection (d)(1) involves two clauses or

conditions, one of which must be satisfied before a writ may

issue.  The first clause, or condition, is referred to as the "contrary to" clause.  The second condition is the "unreasonable application" clause.  <u>Williams</u>, 529 U.S. at 412-13.  In the "contrary to" clause, "a federal court may grant the writ if the state arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Id</u>.  Under the "unreasonable application" clause, a federal court may grant the writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case." <u>Id</u>. at 413.  Habeas relief may not be granted under the "unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief.  <u>Id</u>. at 411.  <u>See also</u> <u>Werts v. Vaughn</u>, 228 F.3d 178, 197 (3d Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 980 (2001); <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877, 891 (3d Cir. 1999), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u> <u>Matteo v. Brennan</u>, 528 U.S. 824 (1999).

    Consonant with <u>Williams</u>, the Third Circuit has held that § 2254(d)(1) requires a federal habeas court to make a two step inquiry of the petitioner's claims.  First, the court must

10

examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims.  See Werts, 228 F.3d at 196-97; Matteo, 171 F.3d at 888-891.  If the federal court determines that the state court's decision was not "contrary to" applicable Supreme Court precedent, then the court takes the second step of the analysis under § 2254(d)(1), which is to determine whether the state court unreasonably applied the Supreme Court precedent in reaching its decision.  Werts, 228 F.3d at 197.

This second step requires more than a disagreement with the state court's ruling because the Supreme Court would have reached a different result.  Id.  AEDPA prohibits such de novo review. Rather, the federal habeas court must determine whether the state court's application of the Supreme Court precedent was objectively unreasonable.  Id.  In short, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court."  Id.; see also 28 U.S.C. § 2254(e)(1).  The Third Circuit has ruled that this presumption of correctness based upon state

11

court factual findings can only be overcome by clear and convincing evidence.  See Duncan, 256 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

## IV.   ANALYSIS OF PETITIONER'S CLAIMS

Having set forth the analytical framework for a habeas review under § 2254(d)(1), the Court will now address the two claims presented by Cradle in his petition for habeas relief.

## A.   Cradle's trial in absentia

Petitioner claims that the trial court abused its discretion and violated his Sixth Amendment right by conducting a trial in his absence.  He states that he did not knowingly and voluntarily waive his right to be present at trial.  In particular, Cradle claims that he wanted to be present at the trial but was precluded from attendance because he had been arrested pursuant to a fugitive warrant in North Carolina.  It appears that Cradle was arrested on the fugitive warrant on May 7, 1996, only two days before the trial had concluded.  (Ra17 11:12-12:14).

Cradle raised this claim on direct appeal, but the state appellate court affirmed the trial court's ruling without discussion.  Accordingly, the Court will look to the trial

12

judge's ruling during the April 16 and 17, 1996 hearings on this issue.

On April 16, 1996, the State moved to have the trial proceed in Cradle's absence, pursuant to N.J. Court Rule 3:16(b), because Cradle's conduct in failing to appear for trial that day evidenced a waiver of his presence.  At the April 16th hearing, Cradle's attorney, Neil Duffy, stated that he did not have authorization from Cradle to proceed without him.  (Ra8 3:19-20).

Upon questioning by the court, Duffy confirmed that he had advised Cradle, by telephone and mail, of the original February 26, 1996 trial date.  This date was adjourned because counsel had another trial proceeding that week.  Cradle failed to appear either for any of the status conferences scheduled or for the April 4, 1996 hearing with respect to a Bruton motion.  (Ra8 4:1-21).  The trial judge noted that the April 16, 1996 trial date was made known at the April 4th hearing.  (Ra8 5:2-4).  In addition, a bench warrant had been issued for Cradle on February 26, 1996, but it was never executed.  (Ra8 5:22-24).  Duffy admitted that he had no verbal communication with Cradle about the April 16th trial date, but he did try to reach Cradle by telephone on several occasions at his last known location.  (Ra8 5:9-10; 6:14-16).  Duffy stated that he had advised a woman, who answered the telephone at Cradle's address, that Cradle's appearance at trial the next day was mandatory.  The woman, who

13

Duffy believed to be Cradle's mother, told Duffy that she would give the information to Cradle when she saw him.  (Ra8 5:9-21; 6:9-10).

The State reminded the court that Cradle had signed a trial memorandum on July 3, 1995, which advised that, if Cradle failed to appear at trial, it could proceed in his absence.  (Ra8 7:10-15).  The court declined to make a ruling that day on the State's motion, reserving decision until the next day.  (Ra8 10:19-23).

On April 17, 1996, Duffy supplemented his opposition to the State's motion to try Cradle in absentia.  Duffy first argued that the February 26th trial date was not an actual trial date because it had been confirmed earlier that Duffy had another trial that week.  Duffy recalled a telephone conversation with Cradle in which he advised Cradle that February 26, 1996 was not an actual trial date.  (Ra9 5:8-25).  Thus, Duffy argued that Cradle's failure to appear on February 26, 1996 and on April 16, 1996 did not constitute conduct evidencing a voluntary and knowing waiver of his right to be present at trial.  (Ra9 6:1-23).

Judge Alley then asked Duffy if he had received any word that Cradle was in the hospital, under a doctor's care, or physically unable to be at court due to health reasons.  Duffy responded no.  Judge Alley also asked if Cradle was out of reach by phone or fax for notification of his mandatory attendance, and

14

again Cradle's attorney answered in the negative.  Duffy did
reply that he had not sent a letter to Cradle about the trial
date, but had a telephone conversation with someone at Cradle's
residence.  (Ra9 9:5-24).  Duffy further confirmed that he had
notified Cradle by letter concerning the February trial date, and
he knew that Cradle had received that letter.  (Ra9 10:11-15).

     Based on all the information provided by counsel, the court
found that Cradle's failure to appear in court for trial was his
voluntary decision.  Cradle's counsel did not produce any notice
or evidence that Cradle was unable to attend trial due to health
reasons.  The court also found that there was no showing that
Cradle was unavailable.  All parties knew on April 4th that the
trial would commence the week of April 16, 1996.  The court
concluded that Cradle made his own decision, for whatever reason,
not to be at trial, and that the circumstances showed his absence
to be "tantamount to a knowing waiver of his right" to be present
at his trial.  (Ra9 10:21-11:10).

     However, several weeks later, on May 7, 1996, Duffy brought
to the court's attention that Cradle had been arrested on a
fugitive warrant in North Carolina.  Duffy had spoken with
Cradle's mother by telephone and she stated that Cradle wanted to
come up for his trial, possibly to testify.  Thus, Duffy
requested a continuance of the trial to allow Cradle to be

15

present.   (Ra17 11:12-12:10).  The testimony of Sheriff's Officer
John Diorio was put on the record since he had a telephone
conversation with Cradle.   Officer Diorio stated that Cradle told
him he did not know he had to be at trial.   Cradle also told
Diorio that he knew his co-defendants were on trial but did not
think that meant he had to be there.   Based on information
provided by Diorio, Cradle told Diorio that he would waive
extradition so that he could appear for trial in New Jersey.   The
earliest this could occur, however, was the following week.
(Ra17 13:11-15:4).

     Despite this information about Cradle's arrest and stated
desire to now attend trial, the court determined that nothing had
really changed since the court first ruled that "Cradle had
refused enough notice of the trial and thought we could
continue."   (Ra17 19:11-18).  The court further stated that "Mr.
Cradle has put himself in the position he's in and we're going to
go ahead."   (Ra17 19:25-20:1).

     At the outset of the case, the trial court found that an
accused's right to be present in the courtroom at every stage of
the trial derives from the Sixth Amendment of the U.S.
Constitution, and applied state law to the facts recited above in
determining whether Cradle knowingly and voluntarily waived his
constitutional right to be present at trial.

16

The Sixth Amendment is made applicable to the States by the Fourteenth Amendment.  Gideon v. Wainwright, 372 U.S. 335 (1963). The accused's right to be confronted with the witnesses against him requires a "face-to-face" meeting; "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."  Illinois v. Allen, 397 U.S. 337, 338 (1970). Indeed, the right to be present at every critical stage of a trial is a "fundamental right of each criminal defendant," Rushen v. Spain, 464 U.S. 114, 117-118 (1983), which is rooted in both the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth and Fourteenth Amendments.  See United States v. Canady, 126 F.3d 352, 360 (2d Cir. 1997)(citations omitted).  The right to be present at trial is "scarcely less important to the accused than the right of trial itself."  Diaz v. United States, 223 U.S. 442, 455 (1912).

Notwithstanding the importance ascribed to this right, it plainly may be waived.  Thus, the Supreme Court has held that a defendant who knowingly absents himself from the courtroom after trial has commenced "leaves the court free to proceed with trial in like manner and with like effect as if he were present." Diaz, 223 U.S. at 445.  However, "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant

17

circumstances and likely consequences." <u>Brady v. United States</u>, 397 U.S. 742, 748 (1970).  Whether the waiver of a known right has been intelligently made "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938).

This Court finds that the standards applied by the state court in reviewing the constitutionality of Cradle's trial <u>in absentia</u> are substantially the same as the federal standard noted above regarding knowing and voluntary waiver of substantial constitutional rights.  The Court also concludes that the trial court's decision is amply supported by the law and the facts as presented in the case.  The state court found that Cradle was duly informed and noticed as to the imminent start of trial.  He was warned that his failure to appear would not preclude the trial from commencing in his absence.  Further, Cradle had signed a pretrial memorandum, which allowed the trial to proceed in his absence should he decline to appear for trial as required. Cradle also knew that he was represented by counsel and that counsel would handle the trial in his absence.  Thus, Cradle received actual notice in court regarding the imminent starting date of his trial as prescribed under N.J.CT.R. 3:16.  Moreover, the court noted that there was no evidence of Cradle's hospitalization, ill health, unavailability, or other hardship

18

that would have prevented him from attending trial.  Cradle also was aware that his co-defendants were at trial.  Consequently, the trial court found that Cradle's failure to appear was a knowing, intelligent and voluntary waiver of his right to be present at trial.

Having reviewed the relevant transcripts and state court record, the Court finds nothing in the state court rulings that is contradictory to the federal standards governing a defendant's waiver of a significant constitutional right, such as a waiver of the right to be present at trial, as set forth in the Supreme Court cases cited above.  Moreover, the Court finds no unreasonable application of the correct governing law to the facts as presented in this case.  See Williams, 529 U.S. 405-09. Therefore, Cradle has not demonstrated that the state court's decision, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  Matteo, 171 F.3d at 891.  Accordingly, Ground One of the petition is denied.

B.  Miranda Violations

Cradle next contends that the trial court violated his federal constitutional rights when it allowed the statements he made during police interrogation to be admitted at trial.  Cradle appears to allege that the police did not adequately advise him of his Fifth Amendment rights as required under Miranda v. Arizona, 384 U.S. 436 (1966).  He also alleges that the trial

19

court engaged in an erroneous analysis in reaching the conclusion that Cradle's statement was admissible.

The statements at issue involve the allegation that Cradle told Officer Estok that he knew co-defendant Pabon from the neighborhood, and that he went with two co-defendants, Pabon and Ball to pick up the other co-defendant McDuffie in New York pursuant to a request from Pabon's mother.  Cradle contends that the admission of this statement was damaging to him at trial due to discrepancies in various other statements by the co-defendants as to who was picked up at what point.  The court found that the statements were admissible based on its acceptance of the officers' testimony as true and credible.

During the trial proceedings, on April 17, 1996, Judge Alley conducted a Miranda hearing in which he determined that the challenged statements by Cradle and the other defendants were admissible because they had made voluntary and knowing waivers of their Miranda rights.  At the Miranda hearing, both Officer Estok and Detective Stebbins testified that Cradle was read his Miranda rights, first at the roadside, and again at the police station before interrogation.  Estok further testified that Cradle was promptly administered Miranda warnings verbally and with the aid of a Miranda card.  The Miranda card had been signed by Cradle.  Aside from noting that Cradle appeared tired, Estok also told the court that Cradle acted as if he was familiar with his rights and

20

responded in an arrogant, dismissive manner.  The testimony by
the officers showed no contention of hostility, coercion,
threats, or other overbearing conduct either during the
interrogation or at the time of arrest.  It also appeared that
Cradle was not handcuffed during the interrogation.

Based on the officers' testimony, the court found that the
State had sustained its burden as to the Miranda warnings.
Specifically, the court stated that there was no real issue as to
the giving of the warnings.  The court found both Estok and
Stebbins truthful in their testimony as to the number of times
they gave the warnings to each defendant, that the officers read
the warnings, and had the card signed on multiple occasions.
(Ra9 102:19-103:3).  As to the issue of waiver, the court ruled
that a waiver could be inferred from the totality of the
circumstances.  Each defendant, having been repeatedly informed
of his Miranda rights, then chose to give statements.  There was
no suspicion of "rubber hoses" being used in a back room to
coerce statements.  Thus, the court found that there was no other
credible explanation for the statements to have been given by
defendants other than their knowing relinquishment and waiver of
their rights.  (Ra9 103:4-15).  The appellate court affirmed the
trial court's ruling without discussion.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme
Court held that in order to protect an accused's Fifth Amendment

right against self-incrimination during the inherently coercive custodial interrogation setting, certain procedural safeguards must be employed.  These safeguards include the explicit warning that the accused "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires."  Miranda, 384 U.S. at 479.

Miranda also provides that the accused may waive his rights, but must do so "voluntarily, knowingly and intelligently."  Id. at 475.  In determining whether there has been a valid waiver of Miranda rights, a court must conduct a two-part inquiry under a totality of the circumstances standard.  Moran v. Burbine, 475 U.S. 412, 421 (1986).  First, the court looks to the voluntariness of the statement, and whether the waiver was freely and deliberately given as opposed to being obtained by coercion, intimidation or deception.  Id.  Second, the court must consider whether the waiver was "knowingly and intelligently" made, that is, whether the accused was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it."  Id.

The "totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved."  Fare v. Michael C., 442

22

U.S. 707, 725 (1979).  This approach includes the evaluation of the subject's "age, education, experience, background, and intelligence, and [] whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."  Id.  It also looks to the person's familiarity with the criminal justice system, the timing of the Miranda warnings and the statement given, the length and nature of the interrogation and the accompanying detention, and any deprivation of sleep or food. See United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989), cert. denied, 494 U.S. 1017 (1990); United States v. Vasquez, 889 F. Supp. 171, 177 (M.D.Pa. 1995).  See also Yarborough v. Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 2151 (2004)(the characteristics of the defendant can include the defendant's age, education, and intelligence, as well as his prior experience with law enforcement).

Further, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986); see also Arizona v. Fulminante, 499 U.S. 279, 288 (1991)(a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion"); Lam v. Kelchner, 304 F.3d 256, 264 (3d Cir. 2002).  Absent police

23

overreaching causally related to the confession, "there is simply
no basis for concluding that a state actor has deprived a
criminal defendant of due process of law." Id. at 164.  Thus,
beyond the necessary and crucial element of police coercion,
courts look to both the characteristics of the accused and the
circumstances of the interrogation in considering whether a
confession is voluntary.  See, e.g., Withrow v. Williams, 507
U.S. 680, 693-94 (1993)(concluding that the voluntariness of the
confession depends upon the totality of circumstances, including
police coercion, length and place of interrogation, the accused's
maturity, education, physical condition, intelligence and mental
health, as well as 'the failure of the police to advise the
defendant of his rights to remain silent and to have counsel
present during the custodial interrogation"); Schneckloth v.
Bustamonte, 412 U.S. 218, 226 (1973)(the voluntariness of a
statement may often depend on whether the accused's will was
overborne, a question that logically turns on the characteristics
of the accused).  The government "need prove waiver only by a
preponderance of the evidence." Connelly, 479 U.S. at 168.

The Court has carefully reviewed the record and finds that
the totality of the circumstances in this case clearly weigh in
favor of voluntariness, as determined by the trial court.  First,
there is no evidence of coercive conduct on the part of the
officers.  Cradle was read his rights, first at the scene of the

24

arrest and then while he was in custody at the police station. His statement was given shortly after he was taken into custody. There was no deprivation of food, sleep or other physical needs that would otherwise serve to overbear a person's will.

Next, Officer Estok testified that Cradle seemed well aware of his rights and was fairly arrogant during the interrogation. Cradle signed the card and freely chose to give a statement to the officer.  There were no factors concerning Cradle's age, mental condition or education which suggested that he did not understand his Miranda rights or the consequences of waiving those rights.

Finally, the statement was fairly innocuous, and did not amount to a confession of any crime.  Thus, even if the Court were to find a Miranda violation of constitutional magnitude, Cradle's conviction may be upheld where the error did not contribute to the verdict, i.e., if overwhelming evidence in the record as a whole supports conviction.  See Chapman v. California, 386 U.S. 18, 22 (1967).[4]

---

[4]   The Supreme Court has recognized two types of constitutional error: structural and trial errors.  Fulminante, 499 U.S. at 306-10.  "A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is per se prejudicial."  Yohn v. Love, 76 F.3d 508, 522 (3d Cir. 1996)(citations omitted).  By contrast, "trial error occurs during the presentation of the case to the jury, and may be quantitatively assessed in the context of all other evidence." Id.  The Supreme Court has held that admission of coerced confessions can never be considered harmless error, Payne v. Arkansas, 356 U.S. 560 (1958); but the Court has applied the

Consequently, after review of the record and the trial court's <u>Miranda</u> ruling, this Court cannot conclude that the determination of the trial court in admitting Cradle's statement resulted in a decision that either was contrary to, or involved an unreasonable application of, clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  <u>Williams v. Taylor</u>, <u>supra</u>.  The trial court applied the correct law and facts in reaching its determination both that there was no <u>Miranda</u> violation and that the statement was voluntarily and knowingly given by Cradle. Furthermore, even assuming *arguendo* that the statement might have been involuntary, they did not contribute to the verdict because there was sufficient evidence of guilt beyond the statement itself, which was not a confession of guilt, that supported Cradle's conviction.  Therefore, the Court will deny federal habeas relief on this claim.

## V.  CERTIFICATE OF APPEALABILITY

The Court next must determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the

---

harmless error doctrine to the admission of involuntary (but noncoerced) confessions.  <u>Milton v. Wainwright</u>, 407 U.S. 371, 372-73, 377-78 (1972).

26

denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For
the reasons discussed above, this Court's review of the claims
advanced by Cradle demonstrates that he failed to make the
substantial showing of the denial of a constitutional right
necessary for a certificate of appealability to issue. Thus, the
Court declines to issue a certificate of appealability pursuant
to 28 U.S.C. § 2253(c)(2).

### CONCLUSION

For the foregoing reasons, this Court finds that Cradle's
§ 2254 habeas petition should be denied on the merits. A
certificate of appealability will not issue. An appropriate
Order accompanies this Opinion.

_____
JOHN W. BISSELL, Chief Judge
United States District Court

DATED: July 11, , 2005

27